Federal v. United States Mr. Canellos Good morning, Your Honors. May it please the Court. The trial court in this case committed two fundamental and reversible errors. The first error was that the trial court assumed that the bigger a business is, the more profits it's entitled to receive. The court assumed without any analysis that if Lincoln had more deposits, the lost deposits at stake here, those deposits automatically would have produced more profits. I'm confused because both sides continue to discuss lost profits, and yet the Court of Federal Claims rejected the lost profits claim. And I don't understand that First Federal is challenging that decision. So when you and the bank continue to talk about lost profits, I get really confused. Your Honor, I can clarify. On page 28 of our reply brief, we actually address plaintiffs' experts' discussion of why these lost deposits is indeed a claim for lost profits. Those are the cash streams associated with the deposits. No, no, but that's confusing. That's not what this case is about anymore. What the Court of Federal Claims said, I understand that the plaintiff here presented this case largely, or perhaps entirely, as a lost profits case to the Court of Federal Claims. But the Court of Federal Claims rejected that claim and said, I'm going to award damages for lost franchise value, a loss of assets, which seems to be a sound theoretical claim. The question is whether the decline in the franchise value is supported by the record. And when you and the bank start talking about lost profits claims, I get really confused because that's not what's involved here. Your Honor, I respectfully disagree. The Court in this case—and I think this is on page 9 of the appendix—the Court acknowledged that this is a lost profits claim. The lost profits are those profits associated—and this is a direct quote from Dr. Kaplan, their expert—it's the lost profits associated with the deposits. In other words, if Lincoln would have kept certain deposits, certain profits would emerge from the use of those deposits. I don't read the opinion as saying that. I read the opinion as saying that they lost deposits. They had to get rid of deposits. The deposits had a market value, and the Court of Federal Claims awarded that market value. Now, there's a real question as to whether the market value of the deposits was supported by the record, and in particular, whether there was any evidence of what the deposits were worth at the time of the breach. But if you want to stand up there and treat this as a lost profits case, it doesn't seem to me that you're addressing the decision of the Court of Federal Claims. Well, we agree, Your Honor, that this is a market valuation case. And whatever appellation you apply, whether it be a market valuation or a lost profits claim, we agree that the Court did not entertain the analysis necessary to determine whether there was a diminution in the market value of these deposits. The law of the circuit is banned in CalFed in the second decision in CalFed in 2005. This court recognized that you can't simply assume that because a business shrinks, it loses value, or simply because a business grows, it engenders a greater value. The other error of this court was that even taking everything that the court said is true, we can accept all of the factual findings in this case, the court awarded the gate point of a windfall in this case because the court determined that some of the deposit attrition from 1990 to 1992 was caused by the breach. The court also determined that some of that deposit attrition was caused by other factors. When it came time to calculating the amount of deposits lost due to the breach, the court assumed that all of the deposits from 1990 to 1992 were lost because of the breach, and that provided a point of significant windfall. With respect to the first error, we know— Wait. Is that separate or the same as this deposit premium issue that you raised with respect to using the wrong gear? They're connected, Your Honor. The second error relates to the amount—assuming you could automatically assume that because you lost deposits, you lost value. Setting aside that error, even if you could make that assumption, the court erred in its calculation of the amount of deposits. The court should have reduced the deposits, the deposit quantum, by those deposits that it concluded were lost for reasons separate and independent of the breach. And why did the court go wrong in this regard? I mean, there was testimony about the 2001 premium. Was there any testimony about a premium other than that premium? The testimony about the premium in this case, Your Honor, was presented in a chart by a plaintiff's expert, Dr. Kaplan. We did not anticipate that the court was going to say the breach is confined to 1990 to 1992 as it did. So we weren't focused—neither party was focused on the premium. We don't have a problem with the 1990 to 1992 premium. The court's error in this case was— Well, was that part of his chart? In his chart, did it also indicate the lower premium that you're advocating here of 2 percent? In the exact same chart, yes, Your Honor. So if the court properly applied, I mean, even correcting for the mistake in applying the 2001 premium to losses that occurred from 1990 to 1992, that overstates their damages by $2 million. Now, with respect to the first error, Your Honor, with respect to the court's failure to analyze the facts of this case, we know that the court speculated because Lincoln's own documents demonstrate that by decreasing the amount of the deposits, they became more profitable. At the appendix at page 400, 421, there's a statement by Lincoln's CEO at the time who stated that by reducing deposits, by closing 12 branches—and this is what the court said was caused by the breach—by closing 12 branches, Lincoln would increase its profits by $1.2 million per year, increase its profits. So that undermines the court's assumption without any analysis that simply by shrinking, Lincoln became less profitable. In fact, the facts of this case demonstrate the contrary. There's other evidence as well. At the appendix at page 400, 721, we illustrate how the deposits that were reduced outside of the branch closures, those deposits were costing in 1990— and that the franchise value declined. And if those deposits had a market value, why isn't it perfectly okay for the court to say, we're going to determine what the market value is and we're going to award that as damages? I just don't understand why the very speculative determination of what the profitability of this bank was going to be in the future has anything to do with this case now. The court of federal claims that says that's too speculative. You won. The court agreed with you that it was too speculative to try to figure out the future profits. We're dealing with a different issue now, and the issue is they lost some deposits which had a market value. Did they prove the market value? You need to address that. And, Your Honor, the answer to that question is no. There was no—the court's analysis of the deposit loss and the deposit premium issue is contained in the appendix at pages 14 through 16. Nowhere in that decision does the court analyze what everyone in this case agreed was necessary to analyze to determine whether or not a premium would manifest upon the disposal of these deposits. Now, there is no assumption that just because you lose deposits—I mean, that is just contrary to the law. It's contrary to economics, the rules of finance. In fact, plaintiff's own experts both acknowledge that if a branch is not profitable, you don't have a deposit premium. You have to determine whether or not there's even a market for these branches. Mr. Swotek, the plaintiff's head of marketing, he indicated that they didn't even intend to sell the deposits. So if you don't have a sale, you can't have a premium. So the court just simply assumed incorrectly—and it contravenes not only this court's holding in Caltech, but it contravenes the law, very basic fundamental principles of economics and finance—that by becoming smaller or attributing these particular deposits, you become more profitable. And that is where the error of the court lies. Whether we call this a lost profits theory or a diminished market value theory, it's the same principle. No analysis was undertaken. No analysis of the criteria that everyone in this case agrees is necessary to determine whether there is an actual diminution in value. And in fact, the record in this case demonstrates that Lincoln's value increased as a result of losing these deposits. That strikes me, frankly, as absolutely wrong in the sense that suppose somebody breaches a contract to deliver wheat, and the wheat has a market value which was above the contract price. You recover the lost value of the wheat. You don't have to show that if you made the wheat into bread, you would have made a profit. That's ridiculous. But that may be the case here with wheat. But with deposits, Your Honor, deposits are liabilities. Deposits are costs. And to determine whether or not those costs have a value above and beyond the value that's associated with the assets, you have to look at the assets that they're matched up against. That is fundamental basic economics. And the court's failure to look at whether or not there was a market for these deposits, whether or not these deposits emerged for profitable branches or unprofitable branches… Your Honor, after Lincoln had treated these deposits, its value increased. We know that because we can look at 407.22 of the appendix. There it illustrates that after, in 1993, after Lincoln ran off these deposits, it was even more profitable. And even – and in fact, in 1992, this is after the court concluded that Lincoln had treated deposits as a result of breach. Lincoln – and this is a quote. This is at page 300.244 of the appendix. This is a quote. Lincoln had the most profitable year, and it's an 85-year history. Before you run out of time, did you raise the offset argument that you make to us to the court of claims? Your Honor, we provided data, but we were prohibited from presenting a new claim after the liability decision. After the liability decision, both parties presented motions. We said, now you have to present a new expert report. And then in response, we will provide an expert report. The court disallowed that. The court would not permit us to present another report examining what you're describing here. Okay. Well, let's hear from the government now. Good morning, Your Honors. And may it please the Court, my name is Paul Hunnenberg, representing Tier One Bank, the successor to First Federal Lincoln Bank. The government makes many arguments – But the way I read energy capital, you had the burden of proof to establish what the market value of the lost deposits were at the date of the breach. That is, at the time of the enactment of FIREA and the regulations in December implementing FIREA. Okay? What evidence did you put on as to the market value of the deposits as of that date? Well, Your Honor, with all due respect, the lost franchise value calculation that the trial court made sought to value the asset, the deposits, the lost deposits, as of the date of the trial. Because it's as of the date of the trial, the presumed date of the trial, that's where the 2001 came in. The experts assumed that was the presumed date of the trial. Are you agreeing with me that there is no evidence as to the value of the deposits as of the date of the breach? I'm agreeing that the trial court did not value the deposits as of the date of the breach. And there was no evidence as to the value of the deposits as of the date of the breach? There was no evidence because the trial court correctly, pursuant to the globe analysis, valued the deposits as of the presumed date of the trial. The evidence on that is – Okay, what case says that? If it's expectancy damages, if we're talking about profits, yeah, you look to the future, to the lost profits in the future. But if it's a question of loss of a valuable asset at the time of the breach, the inability to retain the deposits, what is the case that says you don't value those as of the date of the breach? Well, the energy capital case. We agree with the government that the lost franchise value is a component of expectancy damages. The energy capital case holds that we value expectancy damages as of the date of the breach. But why is this expectancy damages? That was what you sought and that was rejected, and you haven't appealed from that. We have not appealed. What this seeks to value, Your Honor, is the value of the deposits lost as of the date of trial and measured by what they might be expected to earn going into the future. That's exactly the analysis that the trial court made in the globe case, which this court affirmed summarily. In the globe case, the globe, as a result of the breach, sold six branches in 1990 for $165 million, and in 1993 closed its home office. And the trial court, the report submitted by the plaintiffs' experts, valued the deposits as of 1998 and 1999. Is globe the decision of our court? No, of course it's not, Your Honor. But the analysis— That you can value the damages as of the date of the trial rather than the date of the breach. It specifically says it, Your Honor, in the energy capital case. Really? I thought energy capital said the opposite. Energy capital, which was cited in the globe case, looking for the citation. In energy capital at 1330, we said the time when performance should have taken place is the time as to which damages are measured. But it also says right below that that expectancy damages cases are exceptions to the general rule that damages should be measured as of the time of the breach. So it's an exception to the rule. Well, why is it an expectancy damages case that court of federal claims rejected the claim for expectancy damages? Your Honor, the court of federal claims did reject that, but the court of federal claims also found that the lost franchise value was a component of expectancy damages. It just measured different things, Your Honor. As the court correctly points out, when Lincoln first came into the court of federal claims, we had two components of damages with two parts. There was—but they were both lost profits. We also had a cost of replacement capital, which was rejected on some rejectment. But we came in, and the first component was lost earnings for the foregone growth and for the foregone deposits. And as the court correctly points out, Judge Margolis found that both were speculative and refused to award damages for either. As for the lost franchise value, there were also two components, which he thought were expectancy damages. The one was the $250 million lost growth, and he rejected that as being speculative. But the other was the $300 million of deposits by which Lincoln actually shrank. Well, where does he characterize this as an award of expectancy damages? He characterizes it as a lost profits and expectancy damages model, in his opinion. But where does he say that the amount that he's awarding is expectancy damages? He says it, Your Honor, in the appendix on Judge Margolis at 73 Fed Claims 646. 646? 646 appendix, page 14. Yeah. Second paragraph in the left column. As explained above, Dr. Kaplan's lost profits model calculates damages by adding Lincoln's lost earnings from foregone deposits with Lincoln's lost franchise value due to foregone deposits. But then he goes on to say the court concluded that Dr. Kaplan's calculation of Lincoln's lost profits from foregone deposits is speculative. So I don't read that as awarding lost profits with relation to the deposits. I read his opinion as awarding the value of the lost deposits, not the lost profits from them. Judge Margolis characterized it that way because it's built on an assumption as to what the profits would be worth. Lost earnings were rejected, but lost franchise value was clearly upheld, and the award was not clearly erroneous. And again, Your Honor, while the global opinion is not binding on this court, the global opinion wasn't clearly erroneous, and neither is this one. Now, the government counsel raised this issue of the settles. First, we would submit to the court that the trial court did take into account the one setoff or mitigation argument the government made. We know that the government bears the burden of proving offsets. And as government counsel correctly pointed out, the government never asserted offsets as a defense of the trial, nor did it attempt to introduce evidence of offsets. It never introduced specific items by which there should be offsets. But they answered that, and they said, well, we tried to, and we couldn't. Well, but that's not correct, but their explanation, Your Honor, is incorrect. They are referring to a discovery order and a pretrial scheduling order that Judge Margolis entered in 2004. After the liability trial, there was discussion as to where, as the court knows, the trial court found a contract in one of the three but not in the other two. So the issue that was debated throughout 2004 was how do we adjust the damages models to account for the liability rule. And as a result of that, the government advocated for a whole new round of expert reports and a whole new round of depositions. Our expert determined that the most reliable way to adjust was the pro rata reduction, which Judge Margolis accepted and which finding was not clearly erroneous. It was in that context that the judge said the only discovery we're going to have is a deposition of Dr. Kaplan on his pro rata reduction, and there will be no new round of expert reports. But nowhere in that order, and that's at the end of the third volume of the appendix, did the court say to the government, you can't put on evidence of offsets. In addition, Dr. Kaplan's damages theories and damages model as presented at the trial was a year-by-year loss profit, which as the court knows, was a lost earnings, which the court knows was rejected and a lost franchise value. So that was presented year-by-year. Moreover, the government's expert, Dr. Rochester, he testified on this subject about, you know, the correct year of evaluating, of evaluation of the lost franchise value. And he had a chart also, which although it was never put in evidence, he testified, and I note that he, he for the year 2001, had franchise previa higher than the district court, than the trial court. But in any event, Your Honor. So where did the trial court come up with this number? The trial court came up with a 4.38 number from Dr. Kaplan's demonstrative PX 5069 in his testimony, which is in the appendix at 301546. Dr. Kaplan looked at 79 separate branch transactions, deposit transactions. And 4.38, which was what the district court, the trial court applied, was the median premium for all Midwest thrifts in the year 2000, in the first half of 2001. That was on Dr. Kaplan's chart. And if the court remembers, Dr. Kaplan had opined that the deposit franchise premium should be 7.66%, a higher number adjusted for the Midwest based on large branch premiums. The court heard the government's evidence that that number was wrong. The trial court adjusted downward from Dr. Kaplan's 7.66 to 4.38. So the number came, the 4.38 number that was used for the deposit franchise premium, came from Dr. Kaplan's testimony, based on all Midwest thrifts. Which, Your Honor, not also accounts for the things the government says the trial court failed to account for, such as size, location, types of deposits. By using the median, and the government's expert, Dr. Rochester, agreed that the median was the appropriate one to use. The factors the government complains about were considered, and it was not clearly erroneous. So, in other words, the trial court found that Lincoln had definitely established the causal connection between the government's breach and Lincoln's lost profits in the form of lost franchise value. Damages were objectively reasonable at the time of the contract. Basing damages on lost franchise value based on the deposit shrink from 1990 to 1993, that provided a reasonable approximation of Lincoln's damages. And I should also say, Your Honor, that by limiting Lincoln's damages to 46% of the total that Dr. Kaplan had calculated, and the court did account for these so-called non-breach factors, and also the government argued in its post-trial submissions that Lincoln shouldn't be compensated beyond 1992, with which the trial court largely agreed by cutting off the shrink on which it would apply the franchise value to the middle of 1993. Now, turning briefly to our cross-appeal of liability, unlike the government, we're not challenging a single factual finding of the district court in its liability opinion. We're basically saying that the trial court made an error of law in failing to hold, based on this court's opinion in Fifth Third Bank, that Lincoln and the government had entered into binding contracts for supervisory goodwill for Trifederal and for Northrop. So it was an error not to find contracts in those. Based on the facts as found by the trial court, Fifth Third compels a holding that the contracts were formed in all three mergers. There's a difference between this case and Fifth Third, is there not, in the sense that in Fifth Third there were negotiations about each of the transactions, and in here, the only negotiations that took place were about the Great Plains transaction. Well, Your Honor, we submit that, first of all, the negotiations in connection with the Great Plains, given that the government— Is my statement accurate, that there were negotiations about Great Plains, but not with respect to the other two? There were specific negotiations with respect to Great Plains. There was a limited negotiation in the sense that Trifederal, in the Trifederal merger, Lincoln had asked for a 30-year amortization originally, but based on the Great Plains negotiations, had, by the time the agreement was reached, gone down to 25 years. But the court is generally correct. However, our case is different than Fifth Third. Our case is better than Fifth Third. Fifth Third was four transactions over four years, where the amortization periods weren't identical and the documents weren't identical. In our case, you have three transactions over four months, where both the government and Lincoln understood that the terms that govern Great Plains would also govern a Trifederal Norfolk. So, if there are no further questions, I will reserve the balance of my time for rebuttal. Mr. Canellos? Thank you, Your Honor. Very briefly, first to address energy capital, I think I would agree with Your Honor that energy capital requires that if you're going to value deposits lost during a certain time frame, and if you're going to use a premium, it makes sense. Common sense dictates that you have to use the premium that applied in the years of the deposit loss. The 2001 premium had nothing whatsoever to do with facts back in 1990, 1991, or 1992 when the deposits were lost. There's no logical relationship whatsoever. With respect to Globe, there's a big difference between the trial court's decision in Globe and in this case. In Globe, there was a sale. In Globe, the court actually considered the facts of the case, and it took the premium from the sale that actually occurred, and it said, I'm going to make some adjustments, and based upon the data presented to it regarding the valuation of those deposits, the trial court concluded that a certain premium would have manifested. No such analysis was done in this case. With respect to the offset, Your Honor, there was a claim that we did not attempt to raise this offset. That is just counterfactual. Page 60104 of the appendix, that's where the court's order is contained, saying that we could not present an offset. It said that we are restricted, and that is a quote, restricted to the one-day deposition of Dr. Kaplan. So the suggestion that we did not attempt to submit information about an offset is false. And in your brief, in your great brief, you provide us with all of these numbers, I think, that are on page 38, but you're advocating remand here, right? Your Honor, I think remand ordinarily—I think remand in this case offers the promise of shadows. You have an admission by plaintiff's counsel and by plaintiff's witnesses that it would be speculation to determine what would have happened absent the breach. So although we'll take a remand rather than an affirmance, we certainly think that in this case, it sort of begs the question, what's the value of remanding if plaintiff's own witnesses acknowledge that they don't know what would have happened absent the breach? However, ordinarily, certainly, if the court is going to at least—the court should attempt to at least undertake the analysis that everyone in this case agreed you have to do. Now, with respect to the offset, there's another argument I think we're missing. It's not just that there's an offset in this case, Your Honor. It's that the court's damage award in this case was an overstatement of what the court concluded were the damages. The court included in its damage calculation damages which it asserted were not related deposit losses, damages from deposit losses that were wholly unrelated to the breach. We're just asking the court to be consistent in its opinion. If it's going to hold that the breach was responsible for part of the deposit attrition, then the court should simply reduce its damage award by those damages which were caused by other factors. And that is—it's a very elementary, simple, logical correction that the court would need to make. Now, with respect to the liability trial, Your Honor, the liability issue, let there be no mistake. There is not a single negotiation. There's not a single discussion. There's not a single document which would indicate that the tri-federal and Norfolk transactions in this case were anything other than routine regulatory transactions. Every one of the factors that plaintiff in this case claims represents a manifestation of intent to contract was either authorized or required by regulation. And that distinguishes it from Fifth Third? Absolutely, Your Honor. In Fifth Third, we had the government and Mr. Muldoon and Mr. Kirby of the FHLB Cincinnati and Citizens. They said that the deal wouldn't have happened without the treatment of goodwill. As Judge Dyke pointed out, you had negotiations preceding each individual—each of the four transactions in that case. In this case, there were no negotiations with respect to Great Plains and tri-federal, and that's even more compelling in this case because Lincoln knew how to seek extra regulatory protection because it had already done so in the Great Plains transaction. Your Honor, my time is running out. We seek to affirm the court's finding on liability, and we seek to reverse the court's judgment with respect to the damages because it results in a windfall to plaintiff. Thank you. Your Honor, McBurr? May it please the Court. Initially, counsel's recitation of Globe is a complete misstatement of how the franchise premium was calculated. Why don't you stick to your cross appeal? That's over. All right, Your Honor. We're focusing on your reply here. Your Honor, in connection with the Fifth Third argument, Fifth Third does not hold. In fact, Fifth Third considered this issue of negotiation. And Fifth Third, citing Barron Bank shares, pointed out that negotiations are not required in every case as long as the pattern and the circumstances demonstrates that something more, that the court talked about in the DNN Bank case and the Anderson case, and the something more is the pattern and the circumstances and the reality of the times and the parties' understandings. Anderson and DNN Bank represent the extremes, the extremes where we know that in DNN Bank, the acquiring thrift never mentioned goodwill. It wasn't important. And we know that in Anderson, when the government objected to the thrift's request to advertise the goodwill over 40 years, the acquiring thrift relented and said, okay, it's not important to us. That's not this case. This is the something more. This case has the something more. This case has Lincoln's witnesses saying, I thought we had done our, Mr. Thorne, Lincoln's president at the time, I thought we had done our extreme negotiations in Great Plains and that we didn't have to do them again. Mr. Reshevsky, the vice president, said the same thing. And even the government's supervisory agent, Mr. Douglas, said the same thing. Your Honor, we would like affirmance of the district court, the trial court's methodology, reversal of its liability ruling, and that the court reverse and remand with instructions to enter judgment for Lincoln in approximately $9.8 million. Thank you. If the court has no further questions, thank you very much. Case is submitted.